1  RAMIRO MORALES, SBN 167947
   CHRISTINE M. FIERRO, SBN 191660
2  RICHARD A. EGGERTH, SBN 99625
   MARILYN A. ROGERS, SBN 136908
3  MORALES, FIERRO & REEVES
   2300 Contra Costa Blvd., Ste. 310
4  Pleasant Hill, California 94523
   Telephone: (925) 288-1776
5
   Attorneys for Plaintiff
6  HDI-GERLING AMERICA INSURANCE COMPANY

7

8                   UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11 HDI-GERLING AMERICA INSURANCE          )   CASE NO. CV08-1716PJH
   COMPANY, a New York Corporation,       )
12                                         )
          Plaintiff,                       )   **PLAINTIFF HDI-GERLING AMERICA**
13 vs.                                     )   **INSURANCE COMPANY'S**
                                           )   **OPPOSITION TO DEFENDANTS**
14 HOMESTEAD INSURANCE COMPANY,            )   **HOMESTEAD INSURANCE**
   an Pennsylvania Corporation; GREAT      )   **COMPANY AND GREAT AMERICAN**
15 AMERICAN E&S INSURANCE                  )   **E&S INSURANCE COMPANY'S**
   COMPANY, an Ohio Corporation, formerly  )   **MOTIONS TO DISMISS**
16 known as AGRICULTURAL EXCESS AND        )
   SURPLUS INSURANCE COMPANY, and          )   Date:   July 9, 2008
17 DOES 1-10,                              )   Time:   9:00 a.m.
                                           )   Dept.:  3 (Honorable Phyllis J. Hamilton)
18    Defendants.                          )
   _____)

19

20

21

22

23

24

25

26

27

28

---

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Gerling's Complaint States Valid Causes of Action Against
       Both Homestead and Great American, Therefore, Defendants'
       Motion to Dismiss Must be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Defendants Owed a Duty to Provide Coverage to Jonce
       Once the Specific Insurance Underlying Their Policies
       had Exhausted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.    Homestead Owed a Duty to Provide Coverage to
           Jonce Once the Specific Insurance Underlying its
           Policies Exhausted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        2.    Great American Owed a Duty to Provide Coverage
           to Jonce Once the Specific Insurance Underlying its
           Policies Exhausted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    Defendants' Obligation to Provide Coverage For the Underlying
       Actions is Not Controlled by the Other Insurance Provisions in
       Their Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        1.    Other Insurance Provisions Do Not Determine Whether
           Horizontal Or Vertical Exhaustion is Appropriate . . . . . . . . . . . . . . . . 12

        2.    Defendants' Arguments That Their Policies' Other Insurance
           Provisions Eliminate Their Obligations Here, are Premature
           and Not Supported by the Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    D.    Defendants had a Duty to Defend Jonce Prior to the Exhaustion
       of the Gerling Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    E.    Equity Requires that Defendants Reimburse Gerling For a Portion
       of Jonce's Defense Costs in the *Emery Bay* Action . . . . . . . . . . . . . . . . . 19

    F.    Homestead and Great American Had a Duty to Indemnify Jonce,
       Even if They Did Not Owe a Duty to Defend . . . . . . . . . . . . . . . . . . . . . . 21

    G.    If the Court Is Inclined to Grant Defendants' Motion to Dismiss,
       Gerling Should Be Granted Leave to Amend its Complaint . . . . . . . . . . . . . . . 24

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1

**TABLE OF AUTHORITIES**

2

**PAGE(S)**

3

**Cases**

4 *20th Century Insurance Company v. Liberty Mutual*

5      965 F.2d 747 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6 *Aetna Casualty & Surety Co. v. Certain Underwriters at Lloyd's of London*

7      56 Cal.App.3d 791 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

8 *Allen v. City of Beverly Hills*

9      911 F.2d 367 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

10 *Bank of the West v. Superior Court (Industrial Indemnity Co.)*

11      2 Cal.4th 1254 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

12 *Bell Atlantic Corp. v. Twombly ___ US___,    127 S. Ct 1955 (2007)*

13      (citing to *Conely v. Gibson* 355 U.S. 41 (1957)) . . . . . . . . . . . . . . . . . . . . . . . 4

14 *Buss v. Superior Court*

15      16 Cal 4th 35 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23

16 *CSE Ins. Group v. Northbrook Property & Casualty Co.*

17      23 Cal.App.4th 1839 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 *Carmel Development Company v. RLI Insurance Company*

19      126 Cal.App.4th 502 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

20 *Certain Underwriters at Lloyd's of London v. Superior Court (Powerine Oil Co.)*

21      24 Cal.4th 945 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

22 *Community Redevelopment Agency of the City of Los Angeles v. Aetna Casualty & Surety Co.*

23      50 Cal.App.4th 329 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

24 *Commerce & Industry Ins. Co. v. Chubb Custom Ins. Co.*

25      75 Cal.App.4th 739 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26 *Dart Industries, Inc. v. Commercial Union Ins. Co.*

27      28 Cal.4th 1059 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 *DeMay v. Interinsurance Exchange of Auto Club of Southern California*

     32 Cal.App.4th 1133 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Fireman's Fund v. Maryland Casualty*
    65 Cal.App.4th, 1279 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Foster Gardner, Inc. v. National Union Fire Ins. Co.*
    18 Cal.4th 857 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gilligan v. Jamco Development Corp.*
    108 F.3d. 246 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hartford Casualty Insurance Co. v. Travelers Indemnity Co.*
    110 Cal.App.4th 710 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*North River Insurance Company v. American Home Assurance Company*
    210 Cal.App.3d 108 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Pacific Indemnity Co. v. Bellefonte Ins. Co.*
    80 Cal.App.4th 1226, 1235 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Padilla Construction Company, Inc. v. Transportation Insurance Company*
    150 Cal.App.4th 984 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Powerine Oil Company, Inc. v. The Superior Court (Central National Insurance Company)*
    37 Cal.4th 377 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Reliance National Indemnity Co. v. General Star Indemnity Co.*
    72 Cal App.4th 1063 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 18

*Signal Companies v. Harbor Insurance Company*
    27 Cal.3d 359 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*The New Hampshire Insurance Company v. Marine Max of Ohio, Inc.*
    408 F.2d 526 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Travelers Casualty & Surety Company v. American Equity Insurance Company*
    93 Cal.App.4th 1142 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Travelers Casualty Ins. Co. v. Transcontinental Ins. Co.*
    122 Cal.App.4th 949 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Twaite v. U.S.F. & G. Insurance Company*
    216 Cal.App.3d 239, 252 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1 | *USF Insurance Company v. Clarendon American Insurance Company*
2 |    453 F.Supp.2d 972 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18
3 |
4 | **Rules**
5 | Federal Rules of Civil Procedure, Rule 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
6 | Federal Rules of Civil Procedure, Rule 15(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
7 | United States District Court, Northern District of California, Local Rule 7-4 . . . . . . . . . . . . . . . . . 2

1   Plaintiff, HDI-Gerling America Insurance Company ("Gerling") hereby opposes Defendant

2   Homestead Insurance Company's ("Homestead") and Defendant Great American E&S Insurance

3   Company fka Agriculture Excess and Surplus Insurance Company's ("Great American") Motions to

4   Dismiss made to pursuant to Federal Rules of Civil Procedure 12(b)(6).

5                                   **I.  INTRODUCTION**

6   Defendants seek the dismissal of Gerling's Complaint on the grounds that Gerling has not

7   stated a claim for Declaratory Relief and Contribution.  As Defendants' motions are based on a

8   misunderstanding of the Federal pleading requirements and the misapplication of California law,

9   they must be denied.

10  Defendants allege that because Gerling did not extensively quote from Defendants' policies

11  in its Complaint, it has failed to state a cause of action against them.  However, under the Federal

12  pleading rules, it is not necessary to state each and every fact or provision that *may be* at issue.  All

13  that is necessary to state a valid cause of action is that Gerling make clear and plain allegations by

14  which Defendants can know the claims against them and the basis for such claims.  As Gerling's

15  complaint amply meets these requirements, it has stated valid claims against Defendants.

16  Moreover, Defendants' motions are based on a misrepresentation of California law.  Both

17  Homestead and Great American incorrectly argue that California law requires exhaustion of all

18  primary policies before *any* excess policy ever has an obligation to provide coverage.  In fact, as is

19  made clear by the case most heavily relied on by Defendants, *Community Redevelopment Agency of*

20  *the City of Los Angeles v. Aetna Casualty & Surety Company,* 50 Cal.App.4th 329 (1996), whether

21  an excess policy owes an obligation to provide coverage is controlled by the actual language of the

22  policy.  Accordingly, an excess policy, by its terms, can have a duty to drop down and provide

23  coverage before all primary policies are exhausted.  The Homestead and Great American policies are

24  such policies.

25  As set forth herein, both the Homestead and Great American policies were written over

26  specifically identified policies scheduled as underlying insurance.  Upon exhaustion of those

27  policies, Defendants had a duty to drop down and provide coverage to the insured. Upon dropping

28  down, Defendants' policies became primary policies filling in the gaps in coverage left when the

1    insurance specifically underlying their policies exhausted.  The fact that another policy, Gerling's

2    policy, also provided coverage to the same insured, did not alter Defendants' contractual duty to drop

3    down and provide coverage.

4        Despite the unambiguous language in their policies' grant of coverage, Defendants argue that

5    the Other Insurance provisions in their policies should control whether the policies have a duty to

6    drop down.  This argument fails as it requires the re-writing of the policies' insurance agreement

7    which has been specifically rejected by the Courts.  Further, as other insurance provisions only

8    adjudicate coverage between insurers on the same level, it can not control an excess policy's

9    attachment point.

10        Once the underlying primary exhausted, Defendants also had a duty to defend their insured as

11    the generic other insurance language in their defense provisions has been found to be an

12    unenforceable escape clause.  Further, due to their settlement contributions in one of the underlying

13    cases, Defendants, in equity owe Gerling a proportionate share of the defense fees in that action.

14        As set forth herein, Homestead and Great American had a duty to contribute, along with

15    Gerling, to the defense and indemnity of their insured in the underlying actions that are the subject of

16    this litigation.  As Defendants refused to do so, Gerling has valid claims for Contribution and

17    Declaratory Relief against Defendants.

18        Pursuant to LR 7-4, the issue to be decided by Defendants' motions is whether Defendants

19    have shown that there is *no* basis upon which Gerling can state any valid claim against Homestead or

20    Great American for: 1) Declaratory Relief;  or 2) Contribution based on Defendants' duty to defend

21    or duty to indemnify Jonce in either of the Underlying Actions.

## II.  FACTS

23        In this case, Gerling is seeking contribution from Homestead and Great American due to their

24    wrongful refusal to provide coverage to the carriers' mutual insured,  Jonce Thomas Construction

25    Company, Inc. (hereinafter, "Jonce") in two construction defect actions entitled *Emery Bay II*

26    *Associates v. Devcon Construction Incorporated, et al.*, Alameda County Superior Court Case

27    Number RG04144077, and *Chartwell HOA, et al. v. 44 Third Street, Ltd. LP, et al.*, Santa Clara

28    County Superior Court Case Number 1-03-CV-814851 (collectively "the Underlying Actions").

---

1  (Complaint ¶ 6).

2        Gerling issued a policy to Jonce that was in effect for *two months* from June 30, 1995 to

3  September 9, 1995. (Complaint ¶ 9)  In comparison, Homestead issued four umbrella policies to

4  Jonce that were in effect from June 30, 1994 to June 30, 1998.[1] (Complaint ¶ 10)  Great American

5  issued four umbrella policies to Jonce that were in effect from June 30, 1998 to February 6, 2002.

6  (Complaint ¶ 20)

7        By their specific terms, both the Homestead and Great American policies were excess only to

8  specific policies named and identified in their policies' schedule of underlying insurance. (Complaint

9  ¶¶ 11-16; 21-26)  The policies specifically underlying Homestead's policies were issued by United

10  National, AIG and American Equity.(Complaint ¶¶ 13-16) The policies specifically underlying Great

11  American's policies were issued by New Market, Newmarket and Lloyds of London. (Complaint ¶¶

12  23-26) Each of these underlying policies exhausted prior to the settlement of the Underlying Actions.

13  (Complaint ¶¶ 17-19; 27-28)

14        Upon exhaustion of those underlying policies, Defendants had a duty to drop down and

15  provide coverage to Jonce in the Underlying Actions.  (Complaint ¶¶ 11-16; 21-26)  However, when

16  that exhaustion occurred, Defendants refused to either defend or indemnify Jonce.  (Complaint ¶¶

17  31-36; 40-45)  Due to Homestead and Great American's refusal to provide coverage to Jonce,

18  Gerling, even though it had only issued a policy that was effect for 60 days, was forced on its own to

19  defend and indemnify Jonce in the Underlying Actions.  (Complaint ¶¶ 32,34, 36,41-43; 45-47)

20  It was only after Gerling's policy was exhausted that Defendants contributed to the settlement of the

21  Underlying Actions.  (Complaint ¶¶ 36;45)

22                                **III.  LEGAL ARGUMENT**

23  A.     **Gerling's Complaint States Valid Causes of Action Against Both Homestead and Great**
           **American, Therefore, Defendants' Motion to Dismiss Must be Denied**
24

25        Gerling's complaint meets the requirements of the Federal pleading rules for stating valid

26  claims against both Homestead and Great American.  Pursuant to Federal Rules of Civil Procedure

27  _____

28     [1] Gerling is not seeking coverage under the Homestead's policy no. UL-04314.

1  ("FRCP"), Rule 8(a)(2), a complaint requires only a "short and plain statement of the claim showing
2  that the pleader is entitled to relief." Accordingly, a complaint is sufficient if it gives the defendant
3  "fair notice of what the . . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v.*
4  *Twombly,* ___ US___,127 S. Ct 1955, 1959 (2007) (citing to *Conely v. Gibson* 355 U.S. 41, 47- 48
5  (1957)). In reviewing the sufficiency of a complaint, the issue is not whether a plaintiff will
6  ultimately prevail but whether the claimant is entitled to offer evidence to support its claims.
7  *Gilligan v. Jamco Development Corp.*, 108 F.3d. 246, 248 (9th Cir. 1997).
8  Gerling's complaint meets these requirements. As evidenced in Defendants' motions to
9  dismiss, there is no confusion over the claims Gerling is asserting against Homestead and Great
10  American. Defendants do not dispute that Gerling is alleging that, based on their policies' language,
11  Defendants owed a duty, concurrent with Gerling's, to defend and indemnify their mutual insured,
12  Jonce, in the Underlying Actions.
13  Rather, Defendants allege that because Gerling has not quoted certain provisions in their
14  policies in the Complaint, Gerling's complaint is defective. However, it is not necessary for Gerling
15  to have cited to each and every provision in Defendants' policies, which Defendants allege to be at
16  issue, to state a valid claim. It is sufficient under the Federal Rules for a plaintiff to notify a
17  defendant that it has breached its particular contract by not performing a certain action and to reserve
18  further details until discovery. *The New Hampshire Insurance Company v. Marine Max of Ohio,*
19  *Inc.,* 408 F.2d 526 (6th Cir. 2006). In *New Hampshire*, New Hampshire argued, pursuant to a
20  12(b)(6) motion, that Marine Max was required in its complaint to identify the provision of the New
21  Hampshire policy under which it was entitled to coverage. The Court disagreed, stating that it was
22  sufficient for Marine Max to simply notify New Hampshire that it had breached a particular contract
23  by not performing a certain action and to reserve further certain details until discovery. The Court
24  found that New Hampshire was on notice that Marine Max claimed some provision of the policy
25  entitled it to coverage and was free to ask Marine Max what those provisions were in discovery. *Id.*
26  at 529. On that basis, the Court denied New Hampshire's 12(b)(6) motion to dismiss.
27  Homestead's reliance on *Twaite v. U.S.F. & G. Insurance Company,* 216 Cal.App.3d 239,
28  252 (1990), is misplaced. *Twaite* is a California case and as such it does not address Federal

1  pleading rules which apply here. Further, the case addressed the ruling on a motion for summary

2  judgment for breach of contract not a motion on the pleadings relating to claims for declaratory relief

3  and contribution.

4  Moreover, as set forth *infra*, there is no policy language quoted by either Defendant in their

5  motions which acts as a complete bar to Gerling's claims. Accordingly, the additional policy

6  provisions cited by Defendants do not make Gerling's Complaint "fatally defective" but are in fact,

7  irrelevant to the issue of whether Gerling has stated valid claims against Defendants.

8  As Gerling's complaint gives Defendants fair notice of the claims against them and the

9  grounds upon which those claims rest, Defendants' motions to dismiss must be denied.

10  Further, as this case is still in the pleading stage, no discovery has been conducted. Not only

11  have the parties not made their initial disclosures but no written discovery or depositions have taken

12  place. Gerling is entitled to conduct discovery on the policies, including but not limited to,

13  Defendants' underwriting of the policies, the insured's interpretation of the policies, and whether the

14  terms of the policies have been modified by any later agreements. Thus, at this stage in the litigation,

15  there is a question of fact as to whether all of the relevant evidence is before the Court regarding the

16  application of these policies. Without such discovery, Gerling is also not in a position to know

17  whether the policies attached to Defendants' motions are, in fact, authentic versions. For this reason,

18  Gerling specifically objects to Defendants' use of the copies of Defendants' policies attached of their

19  motions.

20  **B.    Defendants Owed a Duty to Provide Coverage to Jonce Once the Specific Insurance
21         Underlying Their Policies had Exhausted.**

22  Contrary to Defendants' assertions, there is no absolute rule requiring the horizontal

23  exhaustion of all primary policies before an excess carrier can ever owe a duty in California. Instead,

24  policies are interpreted based upon their language. "Clear and explicit" policy language governs;

25  there is no room for judicially-created rules unrelated to policy language. *Bank of the West v.*

26  *Superior Court (Industrial Indemnity Co.)*, 2 Cal.4th 1254 (1992). In keeping with these general

27  rules, case law regarding when an excess policy "attaches" or drops down (owes an obligation) has

28  also held that the specific language of the policy governs. *Community Redevelopment Agency of the*

1 | *City of Los Angeles v. Aetna Casualty & Surety Co.,* 50 Cal.App.4th 329 (1996); *Travelers Casualty*

2 | *Ins. Co. v. Transcontinental Ins. Co.,* 122 Cal.App.4th 949 (2004). *Community Redevelopment* did

3 | not rule that "horizontal exhaustion" governs all cases dealing with excess insurance. Rather, the

4 | court made clear, that whether an excess carrier has a duty to drop down upon exhaustion of the

5 | insurance specifically underlying its policies (*i.e.*, vertical exhaustion) or whether all primary policies

6 | must exhaust before it has an obligation (*i.e.*, horizontal exhaustion) depends on the controlling

7 | language in the policies at issue: "if an excess policy states that it is excess over a specifically

8 | described policy, and will cover a claim when the specific primary policy is exhausted, such

9 | language is sufficiently clear to overcome the usual presumption that *all* primary coverage must be

10 | exhausted." *Community Redevelopment,* 50 Cal.App.4th at 339-340.

11 | On the facts of the case, the Court found that the Scottsdale policy at issue specifically stated

12 | *in its insuring agreement* that its obligation would be excess, not only of the policy specifically

13 | underlying the Scottsdale policy, but, "*the applicable limits of any other underlying insurance*

14 | *collectable by the insured.*" *Id.* at 338. (Emphasis Added.) On that basis, the Court found that all

15 | underlying primary policies had to exhaust before the Scottsdale policy had an obligation. However,

16 | the Court's ruling was limited to the language of the policy before it and the Court explicitly

17 | recognized that an excess policy could have duty to drop down and take the place of underlying

18 | insurance if the language of the excess policy so dictated. *Id.* at 332, 339-340. Contrary to

19 | Defendants' assertions, the actual language of an excess policy's insuring agreement determines

20 | when the policy attaches.

21 | Similarly, in *20th Century Insurance Company v. Liberty Mutual*, 965 F.2d, 747 (9th Cir.

22 | 1992), an excess insurer Admiral, which had issued a policy that was excess to only specifically

23 | named policies, argued that *despite its policy language*, California law required that all primary

24 | policies exhaust before an excess policy had an obligation. On that basis, Admiral argued that its

25 | policy attached only after exhaustion of *any* underlying insurance, not just the specifically underlying

26 | insurance as required by its policy. The Court rejected that argument stating that despite Admiral's

27 | contention that its policy was excess over all other insurance, the language of the policy was to the

28 | contrary. Accordingly, the Court found that the Admiral policy dropped down and acted as a

1  primary policy upon exhaustion of the specific underlying Liberty Mutual policy.

2       Here, the insuring agreements of both the Homestead and Great American policies specify

3  that the policies are excess to specifically named policies (the Homestead policies) or that the

4  policies are excess to primary insurance applicable during the same policy period.  In both cases,

5  vertical, not horizontal exhaustion, is appropriate.

6      **1.**    ***Homestead Owed a Duty to Provide Coverage to Jonce Once the Specific***

7          ***Insurance Underlying its Policies Exhausted.***

8       The Homestead policies were clearly written over specifically identified policies scheduled as

9  underlying insurance, not over any insurance no matter when procured or what it covers.  In their

10  insuring agreement, the Homestead policies obligate the insurer to:

11          pay those sums that the insured must legally pay as damages because of .. . property
damage ... caused by an occurrence which occurs during the policy period of this

12          policy in excess of the sums payable as damages in the underlying insurance or would
have been payable but for the exhaustion of the applicable limit of insurance.

13          (Complaint ¶¶ 10-12)

14  The policies define "underlying insurance" as "the insurance policies listed in Schedule A-Schedule

15  of Underlying Insurance Policies."  The policies in listed in Schedule A were issued by United

16  National, AIG and American Equity.  (Complaint ¶¶ 12-16)  Each of these policies were exhausted

17  before settlement of the Underlying Actions.  (Complaint ¶¶ 17-19).

18       The policies do not state that Homestead's obligations is excess to all other primary

19  insurance, or all applicable insurance, scheduled or not.  Instead the policies are specific in naming

20  the policies over which Homestead provided excess coverage.  Based on the plain language of each

21  of its policies, Homestead had a duty to drop down and act as primary insurance *on the sole*

22  *condition* that specifically named underlying insurance issued by United National, AIG and

23  American Equity primary policies were exhausted.

24       Despite this clear language, Homestead argues that its policies require horizontal exhaustion

25  citing to *Community Redevelopment.*  However, Homestead simply ignores the reasoning of

26  *Community Redevelopment* and the language of its own policies.  In *Community Redevelopment*, the

27  insuring agreement at issue stated:

28          The Company shall be liable for the Ultimate Net Loss in excess of the greater of the
Insured's (A) underlying limit An amount equal to the Limits of Liability indicated

1   beside the underlying insurance listed in the Schedule of Underlying Insurance
2   (Schedule A), *plus, the applicable limits of any other underlying insurance
    collectable by the insured.* [emphasis added.] *Community Redevelopment,* 50
3   Cal.App.4th at 333.

4   Unlike the *Community Redevelopment* policies, the Homestead policies do not reference any other

5   underlying insurance in their insuring agreement or in the definition of "underlying insurance." They

6   do not state that Homestead will pay damages in excess of any other underlying insurance. They

7   state that Homestead will pay damages in excess of policies listed in a schedule. Stated simply, the

8   Homestead policies do not require horizontal exhaustion of all primary policies before they are

9   triggered.

10      In actuality, the Homestead language is the same as the language at issue in *Travelers*

11  *Casualty Ins. Co. v. Transcontinental Ins. Co.,* 122 Cal.App.4th 949 (2004), in which the Court

12  found that the policy was a "specific excess" policy to which vertical exhaustion applied. Following

13  the ruling in *Community Redevelopment*, the Court in *Travelers* held that vertical exhaustion was

14  appropriate where the language of the policy dictated that the excess policy had to drop down on the

15  sole condition that specifically named underlying insurance was exhausted.

16      In *Travelers*, the umbrella policy's insuring agreement obligated the insurer to pay damages

17  under Coverage A when a loss exceeded the applicable limits of underlying insurance, as stated in a

18  schedule, or under Coverage B when a loss was in excess of a certain limit or the amount payable by

19  "other insurance, whichever is greater." Similarly, with respect to defense, the policy stated that

20  there would be a duty to defend under Coverage A when "the applicable limit of 'underlying

21  insurance' has been exhausted by payment of claims" or, under Coverage B, when no underlying or

22  other insurance applied. Although other primary insurance was available to a cover a loss, the Court

23  ruled that where the specifically named underlying insurance was exhausted, the plain language of

24  the umbrella policy obligated the insurer to drop down and participate in the defense and indemnity

25  of the claim.

26      The Court noted that the policy made a clear distinction between Coverage A and Coverage

27  B, as coverage under B required the absence of all other coverage, while Coverage A did not.

28  Further, the Court distinguished *Community Redevelopment*, holding that the language of the policy

1  before it was "'sufficiently clear'" to trigger the carrier's defense obligation upon the exhaustion of

2  specifically named underlying insurance, "regardless of the existence or exhaustion of other

3  insurance." *Travelers,* 122 Cal.App.4th at 959.

4      Here, the language of the Homestead policy states that it will pay claims for property damage

5  for sums in excess of underlying insurance, which it defines as specifically scheduled insurance.  The

6  language is different from that in *Community Redevelopment*, in which the policies at issue stated

7  indemnity was owed for "ultimate net loss in excess of the greater of the insured's : (a) Underlying

8  limit – an amount equal to the limits of liability indicated beside the underlying insurance listed in

9  the Schedule of Underlying Insurance. . . *plus the applicability limits of any other underlying*

10  *insurance collectible by the insured. . .*"  [emphasis added].  Accordingly, upon exhaustion of the

11  underlying United National, AIG and American Equity policies, Homestead had a duty to drop down

12  and provide coverage to Jonce.

13      **2.    *Great American Owed a Duty to Provide Coverage to Jonce Once the Specific
         Insurance Underlying its Policies Exhausted.***

14

15      The Great American policies also required Great American to drop down and provide

16  coverage to Jonce before exhaustion of the Gerling policy.  The Great American policies' insuring

17  agreement obligated Great American to:

18      pay on behalf of the "Insured" those sums in excess of the "Retained Limit" that the
        "Insured" becomes legally obligated to pay by reason of liability imposed by law . . .
19      The amount we will pay for damages is limited as described below in the insuring
        agreement Section II. Limits of Insurance.  (Complaint ¶ 20-21)
20

21  The policies define "Retained Limit" as: "the greater of:  1. the total amounts stated as the applicable

22  limits of the underlying policies listed in the schedule of insurance and the applicable limits of any

23  other insurance providing coverage to the "insured" during the Policy Period . . . ." (Complaint ¶ 22).

24  "Underlying Insurance" is defined in the policies in pertinent part as: "the insurance coverage

25  provided under the policies shown in the Schedule of Insurance, or additional policies agreed to by

26  us in writing."  The policies in listed in schedule of insurance were issued by New Market,

27  Newmarket and Lloyds of London.  (Complaint ¶¶ 23-26). Each of these policies were exhausted

28  before settlement of the Underlying Actions.  (Complaint ¶¶27-28 ).

While the insuring agreement in the Great American policies states that the policies are also excess over any other insurance providing coverage to the "insured" *during the Policy Period*, Great American does not allege that there was any other primary insurance issued to Jonce during the time period of its policies (June 30, 1998 through February 6, 2002) other than the already exhausted policies specifically listed in the schedules of underlying insurance.

As Gerling's policy was in effect for only two months, three years prior to the first Great American policy, it did not provide coverage to Jonce during the time period of the Great American policies. Therefore, pursuant to the insuring agreement, the Great American policies are not excess of the Gerling policy but instead, have a duty to drop down and share with Gerling in providing coverage for Jonce in the Underling Actions.

Great American heavily relies on *Padilla Construction Company, Inc. .v. Transportation Insurance Company*, 150 Cal App 4th 984 (2007) to support the contention that its policies require horizontal exhaustion. However, *Padilla* is easily distinguishable on its facts. In *Padilla,* an insured sought coverage from its Umbrella carrier to cover the gap in coverage due to a $25,000 Self Insured Retention ("SIR") under its primary policy. The Umbrella Carrier's policy specifically stated in its insuring agreement that it was excess over all scheduled and unscheduled underlying insurance. *Id.* at 994-995. On this basis, the Court held that all of the underlying primary policies had to exhaust before the Umbrella policy had an obligation including the primary policy with the SIR.

The Great American policy does not contain *Padilla* language in its insuring agreement. Instead, underlying insurance is limited to policies issued during the policy period. Accordingly, *Padilla* has no bearing on Great American's drop down obligation.

Similarly, the Limits of Insurance section in the Great American policies does not control when Great American has an obligation under its policies. The purpose of a policy's Limits of Insurance section is to describe how much the insurer is obligated to pay under a policy *once* the policy is triggered. It does not control at what point an obligation arises under a policy. This distinction is, in fact, made clear by the portion of Great American's insuring agreement which states: "the amount we will pay for damages is limited as described below in . . .Section II. Limits of Insurance."

1    If Great American had wanted to require the exhaustion of all other insurance prior to its
2  policies having an obligation, it should have put that the policies were excess of *all other underlying*
3  *insurance* in the Retained Limit section of its policies.  As it did not, it can not now claim that its
4  policies require horizontal exhaustion. Based on the attachment point laid out in the insuring
5  agreement and the retained limit definition in its policies, Great American had an obligation to
6  participate with Gerling in providing coverage to Jonce for the Underlying Actions.

7    With respect to both Homestead and Great American, the actual language of Defendants'
8  policies controls when their obligation to Jonce arose.   The insuring agreements in the policies
9  issued by both of the two carriers obligate each of them to provide coverage upon the exhaustion of
10  specifically listed primary policies.  As Gerling's policy is not one of those policies, the fact that
11  Gerling had not yet exhausted, did not impact Defendants' obligation to drop down and provide
12  coverage for Jonce in the Underlying Actions.  As both Homestead and Great American refused to
13  do so, Gerling has stated valid claims for Declaratory Relief and Contribution against Defendants.

14  **C.    Defendants' Obligation to Provide Coverage For the Underlying Actions is Not**
       **Controlled by the Other Insurance Provisions in Their Policies**
15

16    Despite the specific language in their insuring agreements, Defendants argue that they do not
17  have an obligation to drop down upon exhaustion of the specifically underlying primary policies
18  based on "other insurance" provisions in the Conditions sections of their policies.  Defendants are
19  wrong for two reasons:  first, other insurance provisions do not determine when an excess policy
20  attaches, as they are applicable only to determining allocations between carriers on the same level;
21  second, assuming that the Homestead and Great American policies should have dropped down in the
22  Underlying Actions, such that they were on the primary layer, these provisions would have to be
23  evaluated on equal footing with the other insurance provision of the Gerling policy.  Such an
24  evaluation cannot be made here, as the policies are not properly before the court.  Moreover, the case
25  law is abundantly clear that other insurance provisions cannot be enforced unless there is no conflict
26  between them.  Here, there is a conflict.
27  / / /
28  / / /

1.         *Other Insurance Provisions Do Not Determine Whether Horizontal Or Vertical Exhaustion is Appropriate.*

"Other insurance" provisions do not control when an excess policy attaches, but rather would come into play with regard to Gerling only after the excess policy dropped down to the primary layer. It is well established under California law that other insurance provisions apply only to policies in the same layer. Stated differently, other insurance clauses become relevant only where several insurers insure the same risk at the same level of coverage; an other insurance dispute cannot arise between excess and primary carriers. *Dart Industries, Inc. v. Commercial Union Ins. Co.*, 28 Cal.4th 1059, 1079 (2002); *Reliance National Indemnity Co. v. General Star Indemnity Co.*, 72 Cal App.4th 1063, 1077 (1999); *Travelers Casualty & Surety Company v. American Equity Insurance Company* 93 Cal.App.4th 1142 (2001) [ "An other insurance clause dispute cannot arise between an excess and primary carriers as they are not 'on the same level'"]; *Carmel Development Company v. RLI Insurance Company*, 126 Cal.App.4th 502 (2005); *North River Insurance Company v. American Home Assurance Company,* 210 Cal.App.3d 108 (1989) [holding that "other insurance" provisions "only become[] an issue when two or more policies apply at the same level of coverage. An 'other insurance' dispute can only arise between carriers on the same level, it cannot arise between excess and primary insurers"]. The purpose of the other insurance provision is to determine allocation between carriers on the same level, insuring the same risk; they do not dictate whether an excess policy requires vertical or horizontal exhaustion before it has an obligation to provide coverage.

In fact, the argument that the other insurance provision controls an excess policy's point of attachment has been specifically rejected by the Courts. *Travelers Casualty, supra,* 122 Cal.App.4th 949; *Carmel Development Company v. RLI Insurance Company*, 126 Cal.App.4th 502 (2005). In *Travelers,* the Court held that "[r]ead in the context of these other 'conditions,' the provisions of the 'Conditions' section set forth rights, obligations and interpretative aids 'applicable to' coverage under the policy rather than conditions that must be fulfilled prior to the existence of coverage." The Court reiterated the general rule that provisions which take away or limit coverage, "must be conspicuous, plain and clear." If the other insurance provision were interpreted to require the exhaustion of all other insurance prior to attachment of the excess policy, the carrier would have

1  limited its coverage in the "boiler plate" conditions section of the policy without indicating that

2  limitation in the insuring agreement or supplemental payments provision. "If Federal intended to

3  have coverage be dependent upon the exhaustion of 'other insurance' it was required to make such

4  an exclusionary clause conspicuous, plain, and clear. It did not do so." *Travelers*, 122 Cal.App.4th

5  at 958.

6      *Travelers* reflects a basic principle in interpreting insurance contracts: provisions which take

7  away or limit must be "conspicuous, plain and clear" to be enforceable. *DeMay v. Interinsurance*

8  *Exchange of Auto Club of Southern California*, 32 Cal.App.4th 1133, 1137 (1995); *Travelers, supra*,

9  122 Cal.App.4th 949. Here, as in *Travelers,* Defendants argue that even though the insuring

10 agreements of their policies are clear, a boiler-plate condition should limit their obligations.

11 However, to hold that the "other insurance" provision determines when an excess policy attaches

12 would be to elevate its impact on coverage over the impact of the insuring agreement. The general

13 rule that other insurance provisions apply only to policies at the same level should apply and should

14 dictate that the provision does not establish that Defendants are entitled to the rule of horizontal

15 exhaustion.

16     *Community Redevelopment* does not support Defendants' contention that the other insurance

17 provision trumps the clear intent of the insuring agreement in their policies. In that case, the

18 policies' insuring agreement specifically stated that the policy was excess to scheduled and

19 unscheduled underlying insurance. In citing to the policy's other insurance provision, the Court

20 merely found that it was consistent with the requirements of the insuring agreement. *Community*

21 *Redevelopment,* 50 Cal.App.4th at 329. Here, Defendants cannot transform what are specific excess

22 policies into ones that require the exhaustion of all primary insurance based upon a boiler plate

23 condition.

24     Recognizing that a limitation on its coverage must be somehow be read into the insuring

25 agreement, Great American argues that the other insurance provision in its policies applies because

26 the insuring agreement references the Limits of Insurance provision, which, in turn, states that it is

27 "subject to the terms and conditions of this policy," and the other insurance provision is a condition.

28 The logic of this argument is tortured and contrary to the rule that limitations on coverage must be

1   "conspicuous, plain, and clear."

2       Moreover, the argument is not new, and has, in fact been rejected by the California courts. In

3   *Carmel Development*, a Fireman's Fund excess policy stated in its insuring agreement that "subject

4   to the other provisions of this policy, we will pay on behalf of the insured those funds in excess of

5   primary insurance that the insured becomes legally obligated to pay as damages." *Id*. at 509.

6   Though the language of the insuring agreement required the policy to drop down upon exhaustion of

7   the specific underlying primary issued by Reliance, Fireman's Fund argued that based on the

8   language "subject to the other provisions of this policy," the other insurance clause was incorporated

9   into the insuring agreement. On that basis, Fireman's Fund took the position that its policy required

10  horizontal exhaustion of all primary policies before it had an obligation.

11       The Court rejected this argument holding that:

12      Fireman's Funds 'insuring language did not clearly and unequivocally inform the
13      insured that it was excess over all other insurance, primary and excess, but buried its
       limitation on the second to last page in a generally worded "other insurance" clause, a
14      condition generally accorded judicial disfavor. *Id*. at 511.

15  Consequently, the Court found that its other insurance language did not trump the language of its

16  insuring agreement and that Fireman's Fund undertook to provide coverage immediately upon

17  exhaustion of the underlying Reliance policy limits. *Id*. at 510-511.

18       Pursuant to *Travelers, Carmel Development* and *American Equity*, Defendants cannot use the

19  "other insurance" provisions in their policies to require exhaustion of all primary insurance and

20  block the obligation set forth in their insuring agreements to drop down and provide coverage for the

21  Underlying Actions upon exhaustion of the underlying policies specifically identified in their

22  policies.

23      **2.**     ***Defendants' Arguments That Their Policies' Other Insurance Provisions***
          ***Eliminate Their Obligations Here, are Premature and Not Supported by the Law***.
24

25       Homestead argues that even if its policies had a duty to drop down upon exhaustion of the

26  specific underlying primary policies and participate on the same level with Gerling, the Homestead

27  policies are, nonetheless, still excess to the Gerling policy due to the Homestead's policies' other

28  insurance provision. This argument fails for a number of reasons.

1    First, in determining an allocation for a loss among multiple carriers on the same layer, other

2    insurance provisions are generally disfavored as they are used by carriers to seek exculpation

3    whenever the loss falls within another's policy. *CSE Ins. Group v. Northbrook Property & Casualty*

4    *Co.,* 23 Cal.App.4th 1839, 1845 (1994). Thus, when there are competing excess-only and pro-rata

5    other insurance clauses in the same layer of coverage, the excess only provision is disregarded, and

6    the carriers pro-rate the loss. *Id.* [pro-ration is the favored method of apportioning a loss among

7    those who have contracted to insure against it]; *Pacific Indemnity Co. v. Bellefonte Ins. Co.,* 80

8    Cal.App.4th 1226, 1235 (2000) [equitable contribution principals require proration between excess

9    and pro rata other insurance provisions]; *Commerce & Industry Ins. Co. v. Chubb Custom Ins. Co.,*

10   75 Cal.App. 4th 739 (1999) [pro-rating loss between excess only and pro-rata provisions]; and

11   *Fireman's Fund v. Maryland Casualty,* 65 Cal.App.4th, 1279, 1304 (1998) [conflicting excess only

12   and pro-rata provisions required to pro-rate.] Pursuant to this well-established rule of pro-ration,

13   regardless of whether any of the policies at issue here contain pro-rata or excess only other insurance

14   clauses, the coverage for the Underlying Actions should be pro-rated between the three carriers.

15   Moreover, in the rare instance that a Court has found no conflict between other insurance

16   provisions, it has done so based on a narrowly tailored provision which, by agreement, shifted the

17   loss to one carrier. In *Hartford Casualty Insurance Co. v. Travelers Indemnity Co.,* 110 Cal.App.4th

18   710 (2003), Travelers' other insurance provision stated that its policy was excess only in the event

19   that its insured, Cornerstone, was an additional insured under any other policy. The other carrier,

20   Hartford, insured Cornerstone as an additional insured. On this basis, the Court found that the other

21   insurance provisions in Travelers and Hartford's policies did not conflict stating:

22       Both policies declare themselves to be excess in the situation where the parties and
         the insurers are most likely to intend that result – when the insured is covered as an
23       additional insured on another party's policy for some specific event or situation. A
         clause that carves out this intended exception to primary coverage is not similar to an
24       escape clause, where the insurer appears to offer coverage that in fact evaporates in
         the presence of other insurance. *Id.* at 727.
25

26   The Court also found that Hartford knew it had issued additional insured coverage and, therefore,

27   accepted the risk providing primary coverage to Cornerstone before Travelers.

28   In contrast, both of Defendants' other insurance provisions are generic excess only

1    provisions.  Neither of them carve out a specific narrow situation in which their policies are excess.

2    Therefore, the narrow exception to the pro-ration rule discussed in *Hartford* does not apply in this

3    case.  Since the other insurance provisions in Defendants' policies do not control Defendants' duty to

4    drop down, Gerling has alleged valid claims for Declaratory Relief and Contribution.

5             Second, application of other insurance provisions cannot be adjudicated in a vacuum.  The

6    provision is only relevant in relation to the other insurance provisions in the competing policies that

7    are on the same level.  Accordingly, for this argument to have any merit, all of the policies at issue in

8    this case, including the Gerling policy, must be before the Court.  Since Homestead has not attached

9    a copy of the Gerling policy nor is it possible for it to do so, the Gerling policy is currently not before

10   the Court.  Therefore, this argument can not be raised on a motion on the pleadings.

11            For these reasons, Homestead's argument that its policies' other insurance provisions would

12   result in it having no obligation, even if it did have an obligation to drop down after specifically

13   defined policies exhausted, is both premature and incorrect.

14   **D.        Defendants had a Duty to Defend Jonce Prior to the Exhaustion of the Gerling Policy**

15            As set forth above, Defendants had a duty to drop down and act as primary insurance once

16   the insurance specifically underlying their policies exhausted.  Thus, upon exhaustion of the

17   underlying policies, Homestead and Great American dropped down to the same level as Gerling's

18   two-month policy.

19            Despite this obligation to drop down, Defendants allege that they did not have a duty to

20   defend Jonce in the Underlying Actions.  However, Defendants' arguments are based on generic

21   other insurance language that has been found to be an escape clause and, hence, void as against

22   public policy.  *USF Insurance Company v. Clarendon American Insurance Company*, 453 F.Supp.2d

23   972 (2006).  In that case, in response to a contribution action brought by USF, Clarendon argued that

24   it had no duty to defend its insured when it was being provided a defense by another carrier based on

25   the excess other insurance language contained in its defense provision.[2]  Clarendon argued that as

26

27            [2] The defense language in the Clarendon policy was: "Our duty to defend is excess over and

28   shall not contribute where the insured has any other insurance under which, but for the existence of
     this policy, any other insurer is obligated to provide a defense."

1   this excess provision did not effect the scope of coverage or its duty to indemnify its insured, but

2   only dealt with its defense obligation, it should be enforced.

3        The Court disagreed, holding that the excess defense provision was a type of escape clause

4   since it allowed Clarendon to make a seemingly iron clad guarantee that it will defend the insured

5   only to withdraw that guarantee in the presence of other insurance, thereby depriving the insured of

6   the benefit of its bargain. *Id.* at 1000. The Court also found that the excess defense clause was also

7   inequitable from the standpoint of other insurers who had undertaken to defend the insured. The

8   Court held that like excess other insurance provisions, excess defense clauses simply attempt to shift

9   the burden away from one insurer wholly and largely to other insurers and thus are objects of judicial

10  distrust. *Id.* at 1001. Therefore, the Court found that the excess insurance language contained in

11  Clarendon's defense obligation was void as against public policy and, consequently, unenforceable.

12  On this basis, Clarendon was found to have a duty to defend.

13       As with the Clarendon policy, the defense language at issue in the Homestead and Great

14  American policies contains an unenforceable other insurance provision. Specifically, the Homestead

15  policies state: "we will have no duty to defend any claim or suit that any other insurer has a duty to

16  defend." (Homestead Motion, p.5:9-16). Similarly, the Great American policies state that the carrier

17  will have a duty to defend when "the applicable Limits of Insurance of the underlying policies listed

18  in the Schedule of Underlying Insurance *and the Limits of Insurance of any other insurance*

19  *providing coverage to the 'insured' have been exhausted.*" [emphasis added.] (Great American

20  Motion, p.6:7-12).

21       Unlike the language addressed in the *Padilla* case, Defendants' "excess" provisions do not

22  state that the policies have an defense obligation in excess of all *underlying* primary insurance but

23  are generic other insurance provisions inserted into the policies' defense language. Like the

24  Clarendon policy in *USF*, this language makes Defendants' defense obligation excess to *all other*

25  *policies* not just underlying primary policies. Therefore, its purpose is not to require horizontal

26  exhaustion but to take away the defense obligation in its entirety in the face of any other insurance.

27  Thus, pursuant to *USF*, the excess other insurance language in Homestead and Great American's

28  defense provisions is void as against public policy, and can not be enforced as against Gerling.

1    Defendants may try to argue that *USF* is inapplicable as it addressed contribution between

2    primary policies. However, as Defendant's policies required them to drop down upon the exhaustion

3    of the directly underlying insurance, once those policies exhausted, Defendants' policies became

4    primary policies on the same level as Gerling's policy.[3]  *USF* is directly on point. Accordingly,

5    Defendants had a duty to defend Jonce upon exhaustion of the specifically underlying primary

6    policies.

7    Moreover, Gerling's policy was in effect for *only two months* from June 30, 1995 to

8    September 9, 1995. Gerling only had an obligation to pay for property damage which occurred

9    during the time period of its policy. In comparison, two of the Homestead policies and four Great

10   American policies provided coverage for the seven years subsequent to Gerling's two month time

11   period. (Complaint ¶¶ 10 and 20). To the extent that any damages at issue in the Underlying

12   Actions arose during the Homestead or Great American policies, such damage took place subsequent

13   to Gerling's policy. Therefore, Gerling would have no duty to defend or indemnify Jonce with

14   respect to such damage. Due to the short two month time period of the Gerling policy, it is

15   extremely likely that this occurred. Therefore, even assuming *arguendo*, that Defendants' other

16   insurance provision in their defense provision is enforceable, there was no other insurance to provide

17   a defense with respect to that damage. In that instance, Defendants had a duty to defend Jonce under

18   their policies.

19   While Gerling may have had a duty to defend the entire action under the tenets of *Buss v.*

20   *Superior Court*, 16 Cal 4th 35 (1997), now that it has provided that defense and the case is resolved,

21   Gerling can seek a defense contribution from Defendants for damages that were not covered under

22   its policy. In *Padilla, supra*, 150 Cal App 4th 984, the insured argued that an excess carrier had a

23   duty to pay the amount of an SIR under a primary policy as there was no other insurance which

24   covered the loss for the amount of that SIR. The Court rejected that argument for several reasons

25   including the fact that the SIR could not be detached from the primary policy and the excess policy

26

27   _____

28   [3] For this same reason, Great American's citing to the case of *Reliance National Indemnity*
*Company v. General Star Indemnity Company*, 72 Cal.App.4th 1063 (1999) for the principal that
there is no right of contribution between primary and excess carriers is disingenuous.

1 | contained language in its insuring agreement that it was excess to all scheduled and unscheduled

2 | underlying policies. However, in so ruling, the Court acknowledged the possibility of such an carrier

3 | bringing an action on this basis. *Id.* at 1000.

4 | As there is a question of fact as to whether any of the damages at issue in the Underlying

5 | Actions first arose during one of Homestead or Great American's policies, Gerling has grounds for

6 | asserting a claim for Declaratory Relief and Contribution against Defendants based on their failure to

7 | defend.

8 | Based on the foregoing, Defendants policies had a duty to drop down and act as primary

9 | policies upon exhaustion of the specific policies underlying their insurance. Therefore, Gerling can

10 | be granted a declaration and a determination that both Homestead and Great American owed a duty

11 | to defend and indemnify Jonce in the Underlying Actions. As such, it is entitled to maintain causes

12 | of action against Defendants for both Declaratory Relief and Contribution.

13 | **E.    Equity Requires that Defendants Reimburse Gerling For a Portion of Jonce's Defense**
   | **Costs in the *Emery Bay* Action.**

14 |

15 | Equity requires that an excess carrier share the burden of defending claims that exceed the

16 | limits of the underlying coverage. *Aetna Casualty & Surety Co. v. Certain Underwriters at Lloyd's*

17 | *of London*, 56 Cal.App.3d 791 (1976). As both Homestead and Great American paid a portion of the

18 | settlement made on behalf of Jonce in the *Emery Bay* action, one of the Underlying Actions, they had

19 | a duty to pay a proportionate share of defense costs in that case. (Complaint ¶¶ 35-38,44-47).

20 | Accordingly, Gerling is entitled to seek a pro-rata contribution from Defendants for the defense fees

21 | incurred in the *Emery Bay* action.

22 | The *Aetna* case involved claims arising from the blowout of an oil well operated by Union

23 | Oil. Union Oil's primary carrier, Aetna, undertook the defense and thereafter, advised Union Oil's

24 | excess insurers that it was approaching exhaustion and requested that the excess carriers assume the

25 | defense. Both refused. After Aetna had paid its indemnity limits, it brought an action against the

26 | excess carriers that after paying its indemnity limits, it no longer had a duty to defend. The Court

27 | ruled that exhaustion of its policy relieved Aetna of its duty to defend.

28 | In addition, the Court ruled that the total defense of claims were to be apportioned on a pro-

1    rata basis among all insurers based on the total amount of indemnity payments made by each insurer.

2    Thus, the Court did not limit the excess carriers' defense responsibility to costs incurred *after* the

3    primary carrier exhausted. In so doing, the Court stated:

4    > [W]e are not considering the rights and obligations between one insured and a single
     > insurer alone. We cannot resolve the dispute by reference to the Aetna contract alone

5    > . . . . we interpret the respective duties of all parties in light of several contracts of
     > insurance, the relative portion of the insured and the insurers as well as the nature of

6    > the calamity giving rise to these claims. No single rubric nor any composite of
     > selected rules of contract construction can alone decide the unique matter at the

7    > bench. *Id.* at 799-800.

8    In *Signal Companies v. Harbor Insurance Company*, 27 Cal.3d 359 (1985), while the Court

9    found that a primary carrier was not entitled to contribution for defense costs from the excess carrier

10   directly above it, the Court specifically refused to formulate a definitive rule regarding an excess

11   carrier's obligation to share in defense costs with a primary carrier:

12   > We expressly decline to formulate a definitive rule applicable in every case in light of
     > varying equitable considerations which may arise, and which affect the insured and

13   > the primary and excess carriers, and which depend upon the particular policies of
     > insurance, the nature of the claim made, and the relation of the insured to the

14   > insurers. . . . The reciprocal rights and duties of several insurers who have covered the
     > same event do not arise out of contract, for their agreements are not with each other

15   > . . . . Their respective obligations flow from equitable principals designed to
     > accomplish ultimate justice in the bearing of a specific burden. [Citations Omitted.]

16   > *Id.* at 368.

17   Based on the principals set forth in *Aetna* and *Signal*, where a claim is over the limits of a

18   primary policy, both the primary and excess insurers can be liable for the costs of defense in

19   proportion to the amount paid by each to settle the claim. Accordingly, a primary insurer who is the

20   only one to defend, has an equitable claim for contribution against the insured's excess carriers, since

21   by fulfilling its own duty to defend, it also fulfilled an obligation owed by the other insurers.

22   In the instant action, Gerling issued a policy that was in effect for *two months*. In

23   comparison, Defendants' policies spanned *seven years*. Gerling received $26,144 in premium from

24   Jonce while Homestead and Great American received, respectively, $151,200 and $218,400.

25   Further, the majority of the damages at issue in the *Emery Bay* case occurred during the time period

26   of Defendants' policies, not Gerling's two month policy. Thus, equity favors that Defendants pay a

27   portion of Jonce's defense costs *even if* their policies are found to not have an immediate defense

28   obligation upon the exhaustion of the directly underlying insurance.

1    Accordingly, Gerling has an equitable right to seek a pro-rata share of Jonce's defense from

2 Defendants. Further, as a claim in equity is factual intensive, it can not be overcome on a motion to

3 dismiss. Consequently, Defendants' motions must be denied.

4 **F.    Homestead and Great American Had a Duty to Indemnify Jonce, Even if They Did Not Owe a Duty to Defend.**

5

6    While Gerling maintains that Defendants must contribute with respect to defense of the two

7 Underlying Actions, it should be noted that the duty to indemnify and the duty to defend are separate

8 duties under general liability policies. Liability policies usually impose two, separately defined

9 obligations on an insurer: (1) to indemnify the insured against third party claims covered by the

10 policy (by settling the claim or paying any judgment against the insured); and (2) to defend such

11 claims against the insured.

12    While it has been held that the duty to defend under a standard, primary general liability is

13 broader than the duty indemnify, the California Supreme Court has expressly recognized that an

14 excess policy can have a duty to indemnify where it has no duty to defend. In finding a duty to

15 indemnify on the part of several excess carriers, the Court in *Powerine Oil Company, Inc. v. The*

16 *Superior Court (Central National Insurance Company)*, 37 Cal.4th 377 (2005), focused on the

17 insuring agreements of the policies before it. The Supreme Court rejected the excess insurers'

18 arguments, based on two landmark opinions,[4] holding that primary policies had no duty to defend or

19 indemnify an insured where a governmental agency had ordered clean-up of a potentially hazardous

20 waste site. In those earlier opinions, the Court had ruled that governmental clean-up orders were not

21 "suits" which had to be defended and did not result in "damages" which had to be indemnified.

22    Turning to the excess policies, however, the Court refused to hold that there was no duty to

23 indemnify simply because some of the policies had a duty to defend and others did not:

24    [U]nlike the standard primary CGL policy, excess/ umbrella policies do not as a matter of course contain a duty to defend, as evidenced by the very policies here in question. From an equitable standpoint, it would be manifestly unfair to penalize the insured for paying a premium to obtain added protection by concluding that the defense coverage endorsements purchased for the seven policies defeat indemnity

25

26

27 _____

28    [4]*Foster Gardner, Inc. v. National Union Fire Ins. Co.*, 18 Cal.4th 857 (1998); and *Certain Underwriters at Lloyd's of London v. Superior Court (Powerine Oil Co.)*, 24 Cal.4th 945 (2001).

1    coverage otherwise clear under the literal policy language.

2    *Powerine*, 37 Cal.4th at 404.  Where some of the excess policies had insuring agreements which

3    included a duty to defend governmental clean-up costs imposed upon the insureds, the Court would

4    not entertain arguments regarding the duty to indemnify premised upon defense-related

5    endorsements which mimicked the language of the primary policies (which linked defense to the

6    existence of a "suit").  Stated otherwise, the court would not hold that there was no duty to

7    indemnify, simply because some of the excess policies had no duty to defend.

8         Significantly, the Court in *Padilla* similarly recognized the two separate obligations and

9    limited its own holding to the issue of defense, as between an insured and the umbrella insurer.  In

10   *Padilla*, an insured construction company asserted an umbrella carrier had a duty to defend, given

11   allegations of continuing damages in the underlying suit against the insured.  The Court found no

12   such duty to defend where the umbrella policy at issue stated: "We will investigate and defend 'suits'

13   brought against an insured for a claim or suit that alleges damages from an 'incident' not covered

14   under:  a.  'scheduled underlying insurance'; and b.  'unscheduled underlying insurance' . . ."

15   *Padilla*, 150 Cal.App.4th at 994.  The policy further defined "unscheduled underlying insurance" as

16   "insurance policies available to an insured, whether: (1) primary; (2) excess; (3) excess-contingent;

17   or (4) otherwise; except the policies listed in the Schedule of Underlying Insurance."  *Id*.  Holding

18   that the policy language dictated that where a primary insurer had defended, the language of the

19   umbrella policy dictated that it did not have a defense duty, the Court made no ruling with respect to

20   indemnity.

21        In discussing the insured's argument that a duty to defend was owed by the umbrella carrier,

22   the Court noted, "[t]he insured's argument is not without considerable force . . . . But there is a core

23   flaw in the logic.  It confuses the obligation of the [primary carrier] to indemnify – which is indeed

24   limited only to that increment of harm after March 1, 2001 – with the obligation of the [primary

25   carrier] to defend a suit that includes an increment of harm after March 1, 2001."  *Id*. at 996.  With

26   respect to defense, the Court recognized that there was a "complete" duty to defend even where

27

28

1   some, but not all, claims or damages were covered under a policy.[5]  *Padilla* emphasized its holding

2   pertained to the *defense* obligation alone:  it reviewed policy language in the umbrella policies

3   pertaining to that obligation and premised its opinion on law regarding the scope of that duty.

4       In this case, Gerling contends that Defendants have an obligation to contribute to the defense

5   of the insured in the Underlying Actions.  However, regardless of whether Defendants owed a duty

6   of defense, they certainly have an obligation to contribute to the indemnification of the insured.  The

7   insuring agreements of both sets of policies at issue establish the attachment point – the point at

8   which an excess carrier has a duty to indemnify – the exhaustion of specifically defined underlying

9   policies.  Again, the Homestead policies obligate Homestead to:

10      pay those sums that the insured must legally pay as damages because of . . . property
   damage . . . caused by an occurrence which occurs during the policy period of this
11  policy in excess of the sums payable as damages in the underlying insurance or would
   have been payable but for the exhaustion of the applicable limit of insurance.
12  (Complaint ¶¶ 10-12)

13  The terms of the policy are explicit:  Homestead was to pay damages when the scheduled policies

14  exhausted, not when all applicable primary, or all other, or all unscheduled policies exhausted.  And

15  they were obligated to pay damages, regardless of any duty to defend.

16      Similarly, Great American's policies state:

17      We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit"
   that the "Insured" becomes legally obligated to pay by reason of liability imposed by
18  law . . .

19  Great American also obligated itself to pay damages once particular primary policies were exhausted.

20  Further, it did so without regard to any potential defense obligation.

21      Both Homestead and Great American seek to shirk their obligations relying on provisions

22  dealing solely with the duty to defend.  However, provisions regarding the duty to defend do not

23  describe the duty to indemnify and do not limit the carriers' obligations regarding indemnity.

24  **G.**   **If the Court Is Inclined to Grant Defendants' Motion to Dismiss, Gerling Should Be
       Granted Leave to Amend its Complaint**

---

[5]The court further noted such a duty was prophylactic in nature under the Supreme Court's ruling in *Buss v. Superior Court*, 16 Cal.4th 35 (1997).  As *Buss* made clear, however, a defending carrier could seek reimbursement from an insured, as the duty to defend entirely was "law imposed" as distinct from "contract imposed."  *Padilla*, 150 Cal.App.4th at 999 n. 14.

1

2    In the event that the Court is inclined to grant either of Defendants' motions to dismiss,

3    Gerling respectfully requests that it be given leave to amend its complaint pursuant to FRCP

4    15(a)(2). It is the express mandate of Rule 15(a)(2) that leave to amend "be given freely given when

5    justice requires." *See, Allen v. City of Beverly Hills,* 911 F.2d 367 (9th Cir. 1990). As this case was

6    filed only a few months ago, Defendants will not incur any undo prejudice if Gerling is allowed to

7    amend its complaint. Accordingly, Gerling requests that if the Court is to rule in favor of

8    Defendants' motions to dismiss, it be done without prejudice to Gerling filing a First Amended

9    Complaint to rectify any insufficiency in its current pleading found by the Court.

10    Gerling also respectfully requests that any ruling on Defendants' motions be limited to the

11    sufficiency of Gerling's complaint. Alternatively, if the Court is inclined to turn either of

12    Defendant's motions to dismiss into a motion for summary judgment, Gerling asks for sufficient

13    time in which oppose such a motion and to bring its own cross-motion for summary judgment on the

14    issues raised.

15                                    **IV.  CONCLUSION**

16    As both Homestead or Great American were required to provide coverage to Jonce upon

17    exhaustion of their directly underlying polices, Gerling has alleged valid claims for Declaratory

18    Relief and Contribution against both Homestead and Great American. Accordingly, Defendants'

19    motions to dismiss must be denied. In the alternative, if the Court is inclined to grant either of

20    Defendant's motions, Gerling requests that it be given leave to file an amended complaint.

21    Dated: June ___, 2008                    MORALES, FIERRO & REEVES

22

23

24                                    By: _____

25                                    Christine M. Fierro
                                      Attorneys for Plaintiff
26                                    HDI-GERLING AMERICA INSURANCE
                                      COMPANY

27

28    S:\DOCS\GA5105\oppbrf.wpd

---

PLAINTIFF HDI-GERLING AMERICA INSURANCE COMPANY'S OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS
24